Good morning, everyone. Welcome. Our first case for argument this morning is the State of Jay Anderson v. Mensah. Mr. Cade. Good morning, Your Honors, and may it please the Court, Nathaniel Cade appearing on behalf of the appellant, the State of Jay Anderson. The District Court committed several errors, two of them I will deal with today. I will not address Monell, and I will explain why in a moment. The two errors are, first, the District Court granted summary judgment to the estate when there was a disputed issue of material facts, specifically, what was Jay Anderson reaching for, if anything. The other error the District Court committed was that it allowed the defense in the underlying case to file a late answer, rather than holding the fact they failed to file an answer after the denial or partial denial of a motion to dismiss constituted admissions, at least for purposes of summary judgment. I will not address Monell today because, obviously, if the Court rules against and denies the first cause, Monell is feudant. With regards to the first error, the District Court erred because it made the assumption that Jay Anderson was reaching for a weapon. As demonstrated in the photographs after the shooting, there was a phone that was on the front console. We don't know, based on the video, whether Jay Anderson was actually reaching for a weapon, whether he was reaching for a phone. That really doesn't matter in a case like this. What's important is what a reasonable officer would have interpreted that motion to be. If a reasonable officer, based on an objective standard, would have interpreted it to be reaching for the gun on the front passenger seat, then that's the gist of the case. It doesn't matter if there was an alternative explanation. The jury is not going to have to decide that question. If this case were to go back to a jury... Why would the jury not determine, Your Honor, what... Because we're going to have... Both sides have experts, and both experts are going to say opposite things. Our expert is going to say that, you know, I can't tell what he's reaching for, and he could have easily... It's not a question for an expert. It's a question of whether a reasonable officer could have interpreted that double reach that the video shows, could have interpreted that as a reach for the gun. If a reasonable officer, based on the objective standard, would have so interpreted it, then judgment for the defense follows as a matter of law. As a matter of law, correct. However, there were... That's what the district judge said, and that's what the legal standard that applies to an excessive force claim. Except the district court said, I find there was probable cause that he reached... It doesn't matter what the district court said, first of all. What we can concentrate on here, because it's a de novo standard of review, summary judgment, as the case comes to us, and what the video shows is a double motion toward the front passenger seat on which there was a gun. And if that motion was reasonably interpreted based on the objective standard as a motion for a gun, regardless of whether there was something else on the seat that the officer may or may not have seen, the important point is that, or the question, the only one on which liability turns is if a reasonable officer in Officer Mensa's position, seeing that motion, would have interpreted it as a motion for a gun, reach for the gun, so that lethal force was justified. Certainly, Your Honor. But a reasonable officer could have interpreted several things. A reasonable officer is highly intoxicated. We don't know how long he had his hands up, where he's at a 90 degree angle with Joseph Mensa. So with Mensa saying stuff, when he turns, you and I, sober, can turn our heads while having our hands up. Someone who's intoxicated, he's turning. Is he purposely reaching, or is he turning? We don't know. And the problem is we don't know, because a reasonable officer would have started the dash cam sooner, we would have had audio, we would know what was going on. Joseph Mensa has no recall whether he asked him for identification. He said, I did, and he said he didn't have it. But we know he did. So his veracity is at issue. We also know that Joseph Mensa said, when asked, did you tell him to put his hands up or on the dash? What did you do? I don't recall. So a reasonable officer would have done several different things. So under the totality of the circumstances, we have to look at the entire existence, not just this move. If we just looked at this move, then what you are doing, Judge, is suggesting that the present case that's before the Supreme Court, Felix v. Barnes, where it's that moment in time under the Fifth Circuit, that's appropriate. That's not the standard in our circuit. No, I'm not arguing for a different standard or for the adoption of the Fifth Circuit's moment in time standard. That's not the standard in our circuit. That's not what I'm suggesting, and that's not what the defense is arguing in this case. It's that as a matter of law, the motion could reasonably have been, or a reasonable officer could have interpreted that motion based on what the video shows of what happened as a reach for the gun. And there's no dispute that it was a gun. Right. We're not disputing there was a gun. Obviously, we don't know the orientation of the gun. We don't know which direction was pointed. We know none of that because the officers retrieved it for whatever reason rather than leaving it for evidence collection. We don't know that, but again, what we know is there are other things on the seat. A reasonable officer would have seen or likely have seen the phone. All Joseph said, Mintz has said, is, I saw a gun and I reacted. Even assuming that fact in your favor, that the officer saw the gun or a reasonable officer or saw the phone as well or that a reasonable officer would have seen the phone in addition to the gun, that doesn't change anything as a legal matter here. Let me ask you this. Chief Judge Sykes talked about a double reach. What is your position on the footage we've seen? Do you see a double reach? Do you dispute that he lowered his arm once? What's your view of what we're looking at? We see him turning. There is no doubt. I don't know, again, because we lack audio, which is why Joseph Mintz, he was drunk, had an argument with his girlfriend. He's in the park. He's woken up. So is he like, screw you, man. I'm going to call my dad. Counsel, I think what's more helpful, if you go back, what I'm listening for, what we're needing you to answer, I believe, is my colleague is trying to pose is, what are the facts that are at issue that would need this to go back to the district court? The facts that are at issue is, what was he reaching for? The only thing that we have is Joseph Mintz saying he was reaching for the gun. So you accept, just so I make sure I understand, are you accepting the fact that there was a reach? I'm accepting that he turned and that his hand dipped. The FBI looked at the video. They even tried doing infrared. They couldn't see that right hand at some point. And so this idea, back to my question, of a reach, and that's not what you see in the video, some double reach. I'm not disputing that he turns and that he's making that motion. I'm saying, I don't know if it's because he's drunk. I don't know if it's because he's grabbing, he wants his phone, if he's been insulted. The point is, the district court credited the only live witness by saying he was reaching for the gun. Well, the reason I'm following up on this is because the district court, I don't recall the district court making a finding about a double reach, but the defendants certainly argue that he lowered his arm repeatedly. I don't know if you're saying, you can't tell whether he repeatedly lowered his arm in the video. Defendants also say he lunged. And I don't know if you're saying you certainly can't tell if he lunged by looking at the video. Those then, to circle back to Judge Pryor's question, would be factual issues better suited to a jury, which then reflects what a reasonable officer saw and would understand and could interpret. Correct. I'm not saying that he lunged. I am saying that you can see that hand lower. Why did that hand lower? Is it because it was a reach or because he's drunk keeping his hands up for a period of time? We don't know how long he had his hands up, right? We don't know if his hands are up for a minute or for four minutes. We know Joseph Mensa is in the park between the time he radios in when he goes to the park and sees the vehicle. It's just under six minutes. We know that he radios about the license plate. We know that the car is not reported stolen and they give a name. It's a female name. So obviously this individual is not the female. What else occurs? Joseph Mensa says, I asked for ID. He said he didn't have it. We know at the autopsy when they cut open his pants, he had identification. We know Joseph Mensa never radios in, hey, this is the name of the suspect, Jay answering date of birth to see if he's a wanted felon. All he did is I saw a gun and he reports it. That's it. Everything else is he turning because he's reaching for the gun? Is he turning because he's drunk? Is he turning because Joseph Mensa said something when he wants to call the phone? So is it the factual question for you is whether or not he was lowering his hand? He could have been because he was lowering his hand. He could all we can see on the video is, and I can't assume that it was a definitive lower. I can't assume it's because he's intoxicated, right? If I'm sober, I can turn and look at Joseph Mensa. If I'm drunk, you know, you keep emphasizing this, Mr. Kate, and it really doesn't matter if there's an alternative explanation because we don't use 2020 hindsight in evaluating split decisions of police officers in the field in responding to armed suspects. And this was an armed suspect. The gun is on the seat and the officer knows it, sees it. And the suspect lowers his arm twice. That's what the video shows. You're not disputing that. As far as I hear your answers, you're disputing the reasons for it. I'm saying his hand lowers. I'm not saying it's a reach judge. I know you're recharacterizing it, but the video shows that the hand goes down twice. And I don't hear you disputing that. Are you? I'm saying his hand dips, whether you call that going down under the dash, we can't say. Twice. Correct. But judge, you have said in a state of eager, the decision you were a panel on, having a weapon is not the same thing as threatening to use a weapon. He never touched the weapon. He didn't, you know, the fact that he... But we have lots and lots of cases that say the officer does not need to wait in that situation for the gun to be engaged and fired. But there's a difference between engaged in fire and touching a weapon. He doesn't even have physical possession of it to do anything with. There is a difference. In fact, we even have the Weinman versus McClone, where the individual is holding a gun, holding a shotgun. An officer decides to bust in. It's never raised. He's physically has it and just shoots the subject. Under this interpretation, the fact that, well, he had a gun and I'm concerned I can shoot him, Weinman would go the other way. And that's not the case. Here, all we know is Joseph Minza has tunnel vision and he says he's reaching for the gun. Right. But that's really a jury question as to what a reasonable officer would do. Is he reaching for the gun or is he reaching for the phone, reaching for the bottle of water and the dash console? I don't know and no one else knows, but that's a jury question. I think we're somewhat conflating the two. The jury is going to be answering fact questions. Correct. Right. And that's why Judge Jackson is really trying to drill down on the facts that you are disputing and Chief Sykes is wanting to know what as far as what are you asking the jury to decide from a legal standpoint? I think a jury has to decide with regards to what a reasonable officer, once they hear the testimony, is it reasonable for Joseph Minza, an objective officer, to have that belief that he was reaching for the gun? And I'm well within my rebuttal time unless there are other questions. Thank you. Thank you. Ms. Baynard. Good morning, Your Honors. May it please the Court. My name is Jasmine Baynard and I represent the appellee Joseph Minza. This is a case in which Officer Minza was confronted by Mr. Anderson's repeated instructions not to do so. Do we know that there are repeated instructions? Because as I read Minza's sworn statements, it doesn't seem like he remembers giving repeated instructions. He does remember one thing in particular saying, I see the gun, don't reach for the gun. But I don't see him saying he remembers giving repeated instructions or any other. He's got a lot of I don't knows in terms of what he said to Mr. Anderson, which is a little difficult from a record point of view. Your Honor, I would submit that Joseph Minza, and when we're talking about statements that Joseph Minza has given, this incident happened in 2016. He gives a statement immediately afterwards. Eight years later during his deposition, I will agree with the Court that there are instances where he says he does not recall and refers back. If we refer back to his original statements, it's I don't know if I'm telling him don't touch the gun, don't reach for it, but I am telling him do not do that, do not do that. So if more than one time he's instructing and it's his perception that Anderson can hear him and can understand him and deliberately chooses not to follow that command. Now, the Court reviewed the record, and I know that in the briefings and in the papers there is a lot made to do by my friends on the other side about this idea that the Court had nothing to review in coming to its summary judgment decision other than Mensa's testimony. But that's not true. We have Mensa's testimony. We have the dispatch audio. We have the video that demonstrates, although a small portion of what happened, a portion of what happened. And during that, and we have that video because Joseph Minza wanted there to be that video. It's because he hit his mic. It's because it recorded 30 seconds back. And that's why we have that video. Now, when the District Court evaluated that record, the District Court made it clear in its order and its order on the reconsideration that it wasn't just crediting Officer Mensa. It was looking at the video and determining under the applicable standard what a reasonable officer under the circumstances would have found. The District Court said, I don't know if Anderson was reaching for a gun or a phone. We will never know. And that's not a question the jury can answer. The District Court or appellants challenged the District Court's alleged decision that officer or that the gun was loaded. The District Court didn't make that finding. The District Court said, I have no way of knowing if the gun was loaded. Let me ask you this. If we knew more than we did now, if we had more audio, and we knew whether Mr. Anderson put his hands up on his own accord versus Minza telling him, because we don't know that Minza told him that. Minza has said, I don't know whether I told him to put his hands up or not. Okay? So if we had audio and Anderson says, you know what, officer, I'm just going to go ahead and put my hands up. And if we had audio where Mr. Anderson says, my hands are up, officer, but I'd like to get my cell phone to record this encounter. So I'm going to reach for my cell phone, officer. If we had audio depicting that scenario, giving us that scenario, could a jury, is it conceivable that a jury would listen to that, look at this footage, listen to Minza's testimony, and decide that it was not reasonable for an officer under those circumstances to think that Mr. Anderson is reaching for a gun and therefore there's an imminent threat of harm such that deadly force is necessary? Your Honor, I mean, respectfully, this is a, I think an invitation to do a lot of 20-20 hindsight, Monday morning quarterbacking. I think that if there was audio or say this went to a jury and the jury got Mr. Anderson's BAC or found out that he had marijuana. No, no, no. I'm asking my question. My question to you is if we had audio, we don't have audio because Mr. Officer Minza didn't turn on his recording earlier. But if we had audio under those circumstances with those facts, could a jury determine that a reasonable officer would not have thought he could shoot the man? I think a jury could under those facts only that Anderson said I want to reach for my phone to, I think a jury still could find that a reasonable officer saying if you have a phone next to a gun and I'm saying do not reach for, do not reach for the gun, I'm not sure that a, I don't know what a jury would do, but I don't think that we can, I don't think we can assume that under those facts, even if the jury had that, that the officer doesn't get to give him the benefit of the doubt. The officer doesn't have to wait or say, hey, okay, fine, slowly just reach for or let me walk up to you, pull the gun away, and then you can take your phone out and start recording. Which is why it's not a jury question at all under our case law. I agree with you. It's a question of law because we have lots of cases that say that officers don't have to take suspects at their word, that they're doing something benign when there's a gun involved. And so the officer wasn't required to consider, much less accept, a benign explanation from a suspect under these circumstances and a verdict as a matter of law would follow from that evidence or summary judgment or at the very least qualified immunity. Your Honor, I agree and respectfully to your point, if we're taking some of these what ifs or factors, I think then I can move to my next point is then even if some of the actions or if Officer Mensa could have done something differently or didn't act perfectly reasonable, we still have qualified immunity and qualified immunity in this circuit would stop the case even if the court didn't decide on the merits because we are not looking at and saying, well, what if or taking all of these potential scenarios into consideration because Officer Mensa saw the gun, he identifies the gun, he radios the backup and says he's got a gun. So while I believe this case rises and falls on substantive law and the issues of qualified or under the Fourth Amendment and the video evidence that we have. So you're questioning whether or not there was a constitutional violation in the first place if we move to qualified immunity as to whether or not there was a violation of excessive force or use of excessive force. I guess I'm not questioning whether there was a constitutional violation at all. What I am trying to do was answer the judge's question that what if we had additional information, could a jury decide something else and I'm taking it back to, well, in that situation, I still believe this would be a case for qualified immunity and I hope that answers your question. I don't believe it does because if we accept the hypothetical that was given, there are then disputed facts and so if there are disputed facts, then qualified immunity would not apply. Of course, the officer could, after the facts have been presented and decided, again, apply for qualified immunity. So I don't think that where you're going, counsel, would be appropriate based on the hypothetical that was given. So I question where you're headed. I guess what I'm trying to say is taking, I get that we're, I'm being given hypotheticals, taking it back to what we know in this case and what Chief Judge kind of explained that it would be as a matter of law. It's not a question. So if we knew that he wanted to reach for a phone next to a gun, it wouldn't matter. It would not matter. That's not a dispute of fact and even if an officer should have taken, which he's not required to, a suspect's word, there's no dispute that the gun's on the seat. I think there, and I mean, I don't know if it's a dispute for the purpose of where we're at now, but whether the phone was on the seat or anything else, right? The photographs that have been- To have a gun out on the seat. So in Wisconsin, too, is an open carry state. You can't open carry a gun on a passenger seat of a vehicle. And you also can't possess- You can or cannot. Cannot in a passenger seat of the vehicle. In a parked car. I'm not sure if the parked or the moving car matters. It's an open carry state. So the, you can't have it concealed on the passenger side at all. And with regard to this kind of possession, even if, and again, trying to avoid- Not concealed, you mean open, right? Yes, open carry. And without trying to do, you know, I don't want to play the second guessing of 20-20 hindsight. There's no, I guess the possession of the firearm would not have been under Wisconsin law anyway, because of Mr. Anderson's intoxication. Let me tell you, I don't, my question was not a pure hypothetical. I'm pointing to the information we don't have because we don't have it in the record. We don't have the audio. And I have to be mindful as we are deciding the case of our case law that says in these excessive forces cases, excessive force cases, you don't, if the person's dead, you don't have their testimony. And all we have is the officer's testimony. So we have to be wary of deciding these on summary judgment. That has to be married with our law about officers' reasonable use of imminent force and split second decisions and so forth. So all of that law is on the table. And here we don't have the facts, a jury wouldn't have the facts of what Mr. Anderson was saying that might have influenced a reasonable officer in that moment, an objective, you know, objective decisions by a reasonable officer in that moment. So I just wanted to address, you know, it wasn't a pure hypothetical, I'm asking. There are gaps in the record because Mr. Anderson is dead, because the video is of the quality it is, and because Mensa said he doesn't know exactly what he said to Mr. Anderson. Your Honor, I agree with you and I understand that the case law in this circuit with regards to deciding excessive force cases when we only have the testimony of the live witness and in cases where video is available, and I believe the district court relied on this and said, yes, I'm looking at when I have video, although video can be open to different interpretations, in the King case, if I have video, we're looking at the evidence as a whole, I have video that does not contradict. And I believe that the court understands or has viewed the video and you see this reach towards a gun. So when we're talking about the facts that are undisputed, whether there's gaps, there's never going to be a perfect record, they didn't have body cams then, even if we would have had a video of the whole six minutes. I'm not sure if you would have heard anything Anderson was saying, this was 2016. Now police officers have body cam, things are a little bit different, but I don't believe that affirming the district court would be contrary to the court or the case law on the circuit that says if we don't have, we should be wary of granting summary judgment in a case. If we had no video, we probably would not be here. If there was no video that kind of substantiated officer Menta's testimony, then maybe we'd be in a different posture. But the video does support it and the undisputed facts that the gun is there, he's reaching for, Menta perceived him to be reaching for it, no reasonable fact finder. But you do understand there, Anderson's estate is contesting what you say is a reach for a gun, so that that would not be undisputed. Anderson's estate is saying he turns, it's a lowering, but certainly not a lunge, not a reach, not a double reach. And I guess I don't understand them to be actually disputing that. But even if we talk about disputes, there's a difference between disputing and having a genuine dispute of material fact. And honestly, Anderson's motivation is irrelevant to the analysis. So there's a gun there, the officer believes him to be reaching for the gun. Whether he made a quick reach for his phone, again, we will never know. And maybe if we did, that would make the situation even more tragic because I am not, that's not falling on me that it is a very, very unfortunate situation, however it plays out. But the case law in this circuit and Supreme Court and qualified immunity was made for cases like this. And for those reasons, I ask that the court affirm the lower court's decision. And with that, my time is concluded. Thank you. Thank you, Your Honor. Briefly in rebuttal, Judge Pryor in response, it was not a concealed weapon in Wisconsin, 941.23 of the Wisconsin Statutes. There are three elements. The third element is the weapon was concealed or hidden from ordinary observation. That's State v. Keith, 498 Northwest 2nd, 865, 1993. It wasn't hidden from observation because Joseph Minza saw it. So it's no longer a concealed weapon. There's no doubt Joseph Minza, had he been arrested at that point in time, would have been convicted for being armed while intoxicated if they had done blood alcohol content. It's a misdemeanor as is carrying a concealed weapon. It's a misdemeanor, not a felony. The issue that I'd like to leave the court with is everything that my colleague here has said goes on the inference that there was a reach as opposed to dipping of the hand, as opposed to anything else. And the question again is, would a reasonable officer believe that to be the case, that it was a reach or that he was dipping? Again, as you indicated, we don't have audio. I heard, you know, Joseph Minza wanted everyone to see the video. If Joseph Minza wanted people to see the video, he would have turned on his squad lights the minute he got into the park. That would have activated the video and the audio. Joseph Minza, when he first had contact, would have activated from his chest to turn on the dash cam. So it can't be that Joseph Minza wanted posterity when that's not the case. Thank you. We ask the district court be reversed. Thank you. We'll take the case under advisement.